**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

JACQUELYN B. N'JAI,         )
                                      )
        Plaintiff,       )
                                      )
      v.                 )
                                      )     Civil Action No. 10-1323
PITTSBURGH BOARD OF PUBLIC   )     Judge Nora Barry Fischer
EDUCATION, IMANI CHRISTIAN   )
ACADEMY, NAACP, MILTON RAIFORD,   )
JR., MARLON BARNETT, SHERICE COLES,   )
MAISHA JOHNSON, JASON WASHINGTON,   )
DERRICK TURNER,   )
                                        )
        Defendants.    )

## MEMORANDUM OPINION

### I.    Introduction

This matter is before the Court on Defendant Pittsburgh Board of Public Education's (the "Board") Motion for Order to Show Cause Why an Injunction Should Not Be Issued Directing the Clerk of Court to Refuse to Accept Complaints filed by N'Jai Against the Pittsburgh Board of Public Education. (Docket No. 13). The Board argues that Plaintiff Jacqueline B. N'Jai ("N'Jai") should be enjoined from filing further lawsuits against it in which she attempts to re-litigate previously resolved matters. N'Jai adamantly refutes the Board's position in this case, repeatedly arguing that it is different from her prior actions. (Docket No. 17 at 2). This matter has been fully briefed and is ripe for disposition. For the reasons discussed herein, the Board's motion (Docket No. [13]) is DENIED.

### II.    Procedural History

On October 8, 2010, N'Jai filed a Complaint against the Board, among other defendants. (Docket No. 4). Because N'Jai referred to various of the defendants as "Defendants" throughout

her Complaint, it was unclear which claims she asserted against each defendant. Although N'Jai's claims were not well articulated, she continuously stated throughout her pleadings that her claims were against the Board for "invasion of privacy" and "retaliation." (Docket No. 104-3 at 2). On May 2, 2011, N'Jai filed an Amended Complaint wherein she clarified her claims against the Board to some degree. (Docket No. 106). Plaintiff's claims against the Board now appear to be narrowed to Count VIII for the Board's alleged violation of the Privacy Act, 5 U.S.C. § 552a, and Count IX for intentional infliction of emotional distress, although N'Jai continues to reference vague acts of retaliation by Board employees in her Amended Complaint. (Docket No. 106 at 72-81).

The Board filed its motion for an injunction on December 22, 2010. (Docket No. 13). N'Jai responded to the Board's motion for injunctive relief in two separate documents:[1] (1) Response Motion to Motion for Rule to Show Cause Why an Injunction Should not be Issued Directing the Clerk of Courts to Refuse to Accept Complaints Filed by Jacqueline B. N'Jai A/K/A/ Jacqueline B. N'Jai Against the Pittsburgh Board of Public Education (Docket No. 17) and (2) Response Brief to Motion for Rule to Show Cause Why an Injunction Should not be Issued Directing the Clerk of Courts to Refuse to Accept Complaints Filed by Jacqueline B. N'Jai A/K/A/ Jacqueline B. N'Jai Against the Pittsburgh Board of Public Education (Docket No. 18). To address the Board's motion, the Court held hearings on February 9, 2011; February 11, 2011; and February 22, 2011. (Docket Nos. 72, 73, 74).

---

[1]

In her responses, N'Jai often defends her claims against the Board's Motion to Dismiss. (Docket No. 10). The Court denied the Board's Motion to Dismiss, as moot, once N'Jai filed her Amended Complaint. (Docket No. 107). The Board has since filed another Motion to Dismiss, or in the Alternative, Motion for Summary Judgment. (Docket No. 115). This motion is currently pending before the Court.

Following the hearings, the Court ordered the submission of proposed findings of fact and conclusions of law. (Docket No. 47). The Board filed its proposed findings of fact on April 7, 2011. (Docket No. 99). On April 20, 2011, N'Jai filed documents with the Court collectively titled "Proposed Taking Findings of Facts and Conclusions of Law as True; in Light Most Favorable to Pro Se Plaintiff, Jacqueline B. N'Jai."[2] (Docket No. 104). The Board responded by filing its counterstatements on May 5, 2011. (Docket No. 110). Finally, N'Jai filed her counterstatements on May 9, 2011. (Docket No. 111).

## III. Findings of Fact

Pursuant to Federal Rule of Civil Procedure 52(a)(2), in granting or refusing preliminary injunctive relief, the court must set forth findings of facts and conclusions of law which constitute the grounds of its action. FED. R. CIV. P. 52(a)(2). "The findings and conclusions may be stated on the record after the close of the evidence or may appear in an opinion or a memorandum of decision filed by the court." FED. R. CIV. P. 52(a)(1). Rule 52 requires that the district court make the findings and conclusions as the findings, in part, serve as a necessary aid to the appellate courts. *See Bradley v. Pittsburgh Board of Education*, 910 F.2d 1172 (3d Cir. 1990) (vacating the district court's rejection of a preliminary injunction because of its failure to comply with Rule 52); *see also PharMethod, Inc. v. Caserta*, 382 F.App'x. 214, 216 (3d Cir. 2010) (citing *Berguido v. Eastern Air Lines, Inc*., 369 F.2d 874, 877 (3d Cir. 1966)). "The failure

---

[2]

In sum, this filing consists of four separate documents titled: "(1) Narrative Statements of Facts (Docket No. 104-2); (2) Introduction of Aggregating Circumstances and Facts (Docket No. 104-4); (3) Proposed Points to Use in Findings of Facts (Docket No. 104-5); and (4) Proposed Conclusions of Law to Show Good Cause Not to Sanction Plaintiff (Docket No. 104-6)." *Id*. As part of her proposed findings of fact, N'Jai submits extensive charts which are largely confusing and mostly contain conclusions as well as legal argument. In addition, N'Jai references prior claims such as a worker's compensation claim from 1998. Although the Court will review N'Jai's extensive litigation history against the Board in both state and federal court, this Court will not address the merits of N'Jai's previously litigated claims.

of the trial judge to comply literally with the provisions of Rule 52(a), although it has been characterized as a 'dereliction of duty,' is not always a ground for reversal and remand with instructions to make specific findings as required by the rule.'" *PharMethod, Inc.*, 382 F.App'x. at 217 (quoting *Hazeltine Corp. v. Gen. Motors Corp.*, 131 F.2d 34, 37 (3d Cir. 1942)). "As long as the district court's opinion affords a 'clear understanding of the basis of the decision .... and resolve[s] the major factual disputes, the mere formal requirement of separation of findings of fact and conclusions of law has been held not sufficient to necessitate a reversal.'" *Id.*

At the hearing on February 9, 2011, the Board offered the testimony of Nancy Kusko, the Director of Benefits Administration for the Board, and entered into evidence a number of documents. (Docket No. 72 at 4). The Court finds her testimony credible.[3] *Id.* N'Jai countered with her own testimony. (Docket No. 72 at 24). Throughout the hearing, N'Jai submitted 31 documents into evidence including court documents from prior lawsuits as well as email communications with employees of Pennsylvania Employees Retirement System ("PSERS"). (Docket No. 45-1). In addition, the Board submitted communications that it has had with PSERS regarding N'Jai's benefit payments. (Docket No. 72 at 6-7). These documents have been admitted into evidence and have been marked as exhibits. (Docket No. 45-1). The Court has considered and weighed all evidence before it including exhibits and testimony.

---

[3]

This Court is tasked with assessing a witness' credibility. "When findings are based on determinations regarding the credibility of witnesses, Rule 52(a) demands even greater deference to the trial court's findings; for only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of a belief in what is said." *Travelers Cas. and Sur. Co. v. Insurance Co. of North America*, 609 F.3d 143 (3d Cir. 2010) (quoting *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564 (1985)). To the extent that the district court's conclusions rest on credibility determinations, appellate review is particularly deferential. *Id.*

Given the nature of the present dispute and its relation to prior lawsuits filed by N'Jai against the Board,[4] the Court makes the following findings of fact regarding her claims in the current lawsuit against the Board as well as N'Jai's prior lawsuits in both federal and state court:

### A. Facts Relating to N'Jai's PSERS Account

1. N'Jai is a former employee of the Board, who was officially terminated on October 25, 2001. (Plt. Ex. 26); (Docket No. 72 at 68).

2. The Board is a political subdivision and local agency. (Docket No. 74 at 52).

3. Following her separation from the Board in 2001, N'Jai applied for retirement benefits with the state agency that manages the public pension system for education employees in Pennsylvania, PSERS. (Docket No. 72 at 5, 68-69). N'Jai was approved and received a pension benefit. (Docket No. 72 at 68-69).

4. At the time N'Jai separated from the Board she used two different mailing addresses: (1) 519 Rebecca Avenue, Apt. D, Wilkinsburg, PA 15221 (the "Rebecca Avenue Address"); and, (2) P.O. Box 10133, Pittsburgh, PA 15232 (the "P.O. Box"). (Plt. Ex. 1); (Docket No. 18-1 at 17); (Docket No. 72 at 79).

5. At the time N'Jai was separated from the Board in 2001, N'Jai used the Rebecca Avenue address as her primary address. (Docket No. 72 at 69). N'Jai is not sure when she started to use her P.O. Box address as her primary address. *Id*. She estimates that it was between 2005 and 2007. *Id*. at 69-70. At the hearing on February 9, 2011, N'Jai provided a PSERS form that it received from her on April 19, 2007 in which N'Jai provided that her P.O.

---

4

*See N'Jai v. Floyd*, 2009 WL 4823839, at *6, Civ. Act. No. 07-1506 (W.D. Pa. Dec. 9, 2009), *aff'd*, 386 F. App'x. 141 (3d Cir. 2010).

Box address was her current address.  (Plt. Ex. 1); (Docket No. 18-1 at 18); (Docket No. 72 at 71).

6.      N'Jai worked as a part-time employee for the Wilkinsburg School District ("Wilkinsburg") during the 2004-05 school year.  (Docket No. 72 at 34, 73).

7.      N'Jai also began employment with a private school in November 2004, the Imani Christian Academy, but she continued to work for Wilkinsburg in a part-time capacity during the 2004-05 school year.  (Docket No. 72 at 101-102).  By 2006, N'Jai was no longer working for Wilkinsburg. (Docket No. 72 at 76, 102).

8.      Deductions were taken from N'Jai's pay while she was at Wilkinsburg that went toward her PSERS retirement account.  (Plt. Ex. 1); (Docket No. 18-1 at 19); (Docket No. 72 at 34, 73-74, 89-90).

9.      At some point in time between the years 2005 and 2007, the Rebecca Avenue address no longer was a valid address for N'Jai. (Plt. Ex. 1); (Docket No. 18-1 at 17); (Docket No. 72 at 69-70, 78).

10.     N'Jai apparently did not notify the Board of an address change between the years 2005 and 2007, (Docket No. 72 at 78-79), nor was she required to do so by the Board because she was no longer an active employee. (Docket No. 72 at 5-9, 100).

11.     N'Jai received her pension benefit via a monthly direct deposit to her bank account, except in one instance in February 2010 where PSERS withheld two direct deposit payments, (Docket No. 72 at 25, 69), because it believed it did not have a correct mailing address for N'Jai for a period of over 15 months. (Plt. Ex. 1); (Docket No. 18-1 at 15, 23); (Docket No. 72 at 91).  N'Jai did not receive paper documentation for the monthly direct deposit. (Docket No. 72 at 80).

12.     In January or February 2007, PSERS mailed an envelope to N'Jai that was addressed to the Rebecca Avenue address. (Plt. Ex. 1); (Docket No. 18-1 at 19). Underneath PSERS' return address are the words "address service requested." *Id*. The envelope was undeliverable as addressed and because PSERS had requested "address service," the U.S. Postal Service sent PSERS a "Form 3547" informing PSERS that N'Jai's new address was the P.O. Box.[5] *Id*.; (Docket No. 72 at 27).

13.     On April 4, 2007, PSERS sent N'Jai a letter, addressed to the P.O. Box, notifying her that it may have important information in its office for her and that before this information can be sent to her, it needs to receive notice of her current address. (Plt. Ex. 1); (Docket No. 18-1 at 18). The lower portion of the letter is a blank form that directs N'Jai to provide her social security number, date of birth, current address, telephone number and signature. *Id*. The letter states that if the social security number and date of birth match PSERS' records, it will update N'Jai's address and forward any documents in its possession. *Id*.; (Docket No. 72 at 27). N'Jai completed this form providing her P.O. Box address as her current address. (Plt. Ex. 1); (Docket No. 18-1 at 18). PSERS received the form on April 19, 2007. (Plt. Ex. 1); (Docket No. 18-1 at 18); (Docket No. 72 at 27, 92).

14.     In February 2008, PSERS sent a letter to N'Jai at the Rebecca Avenue address. (Plt. Ex. 1); (Docket No. 18-1 at 19). This letter informed her that during the 2004-2005 school year, her service to Wilkinsburg as a part-time school employee was reported to PSERS and contributions were deducted from her wages and sent to PSERS. *Id*. The letter further informs N'Jai that she did not meet the minimum employment requirements (500 hours or 80 days of

---

[5]

The U.S. Postal Service charged PSERS 75¢ for the "address service." (Plt. Ex. 1); (Docket No. 18-1 at 19).

employment) during the 2004-2005 school year and, therefore, her contributions in the net amount of $512.37 will be returned to her. *Id.*; (Docket No. 72 at 27).

15.    Plaintiff's Exhibit 1 contains an envelope marked "Return to Sender. Not deliverable as Addressed." (Plt. Ex. 1); (Docket No. 18-1 at 20). It appears that PSERS attempted to send N'Jai a letter at the Rebecca Avenue address and that this letter was returned to PSERS on March 7, 2008. (Plt. Ex. 1); (Docket No. 18-1 at 20); (Docket No. 72 at 28).

16.    In or around February 2009, PSERS mailed a 1099 Federal Income Tax Form to N'Jai at the Rebecca Avenue address. This document was returned to PSERS because it was not deliverable as addressed. (Plt. Ex. 1); (Docket No. 18-1 at 21); (Docket No. 72 at 28).

17.    In or around January 2010, PSERS sent a 1099 Federal Income Tax Form to N'Jai at the Rebecca Avenue address. This mailing was returned to PSERS because it was not deliverable as addressed. (Plt. Ex. 1); (Docket No. 18-1 at 22); (Docket No. 72 at 28).

18.    PSERS has a procedure for automatically discontinuing payment if, after 15 months, they do not have a correct address for a pensioner. (Plt. Ex. 1); (Docket No. 18-1 at 15); Plt. Ex. 11); (Docket No. 72 at 91).

19.    In or around February and March 2010, PSERS suspended payments to N'Jai because it believed it had an invalid address for her for at least 15 months. (Plt. Ex. 1); (Docket No. 18-1 at 15); (Plt. Ex. 15).

20.    Because PSERS removed N'Jai from its payroll, two direct deposits that would have otherwise been made to her bank account on February 26, 2010 and March 31, 2010 were not made. (Docket No. 72 at 25, 28-29).

21.    When N'Jai realized that the direct deposit had not been made to her account, she contacted PSERS and spoke with a person named Sandra J. Boyle. (Docket No. 72 at 29). N'Jai

also communicated with other persons at PSERS via telephone and email after the pension benefits were suspended, but she does not remember the names of these persons other than Sandra Boyle and a person named Evelyn Tatkovski. (Plt. Ex. 9); (Plt. Ex. 11); (Docket No. 72 at 30-32, 99)   All of the PSERS employees N'Jai communicated with were located in PSERS' Harrisburg office. (Docket No. 72 at 100).

22.     As a result of N'Jai's conversation with Ms. Boyle, N'Jai completed and submitted a "change of address for PSERS retirees" form on March 1, 2010. (Plt. Ex. 1); (Docket No. 18-1 at 25); (Docket No. 72 at 29, 31-32, 87).

23.     On March 3, 2010, N'Jai sent an email to "PS, Contact" stating that on February 26, 2010 she did not receive her direct deposit check. (Plt. Ex. 9).  N'Jai stated that she called to find out why and was told that her 1099 form had been returned to PSERS and that it would take 3-4 weeks to issue payment. *Id*.  N'Jai also requested an explanation in writing as to why the direct deposit was suspended. (Plt. Ex. 9).

24.     On March 4, 2010 a person named "Carol" emailed N'Jai and stated that it is PSERS practice to temporarily suspend a direct deposit when an invalid address is involved. (Plt. Ex. 9).

25.     On March 4, 2010, N'Jai sent another email to "PS, Contact" stating that she faxed a change of address form on March 1, 2010. (Plt. Ex. 9).

26.     On March 9, 2010, N'Jai sent another email to "PS, Contact" requesting a written policy that states PSERS can suspend direct deposit because PSERS lacks a correct address. (Plt. Ex. 9). N'Jai stated that PSERS has had the P.O. Box address since 2001. *Id*.

27.     On March 11, 2010, N'Jai's March 9, 2010 e-mail was forwarded to a PSERS employee, Sandra Colantuono. (Plt. Ex. 11).

28.     On March 12, 2010, Ms. Colantuono sent an email to N'Jai, requesting that N'Jai fax PSERS a letter indicating her correct address.  (Plt. Ex. 11). N'Jai responded that she had already sent a signed letter.  *Id.*

29.     Sandra J. Boyle of PSERS then sent N'Jai a letter on March 31, 2010, explaining that PSERS had made an error and was in the process of reinstating her monthly direct deposit. (Plt. Ex. 1); (Docket No. 18-1 at 23); (Docket No. 72 at 28-29).   Ms. Boyle stated that the funds that should have been electronically deposited into N'Jai's account on February 26, 2010 were not issued until March 22, 2010 and the funds due to her on March 31, 2010 were not issued until April 8, 2010. *Id.*  The delayed funds were ultimately electronically deposited into N'Jai's account. (Docket No. 72 at 75); (Docket No. 74 at 43).

30.     On April 12, 2010, PSERS received a request from N'Jai for her PSERS account records pursuant to the Pennsylvania Right to Know Law,[6] including all written information regarding the change in the address PSERS had on file for N'Jai. (Plt. Ex. 8); (Docket No. 72 at 25, 31, 32, 98).

31.     PSERS responded to N'Jai's request on April 16, 2010 by providing records responsive to her request along with a cover letter signed by Evelyn Tatkovski.  (Plt. Ex. 1); (Docket No. 18-1 at 24).   Ms. Tatkovski's letter informed N'Jai that PSERS members are not required to file a Right to Know Law Request for information about their own accounts.  *Id.*

32.     Aside from the two pension payments from February 26, 2010 and March 31, 2010 that were delayed, N'Jai has continuously received a benefit from PSERS since late 2001. (Docket No. 72 at 69).

---

[6]

65 PA. C.S. § 67.708.

33.     One of the documents that PSERS sent N'Jai in response to her request for records from her PSERS account is an untitled spreadsheet. (Plt. Ex. 1); (Docket No. 18-1 at 26); (Docket No. 72 at 32).   This spreadsheet contains 11 columns and 25 rows. *Id*.  The columns contain the following headings: Type, Start Date, Stop Date, Address, City, State, Zip, Inserted by, Inserted Date, Updated by, and Updated Date. *Id*.  The following subparagraphs describe the data contained in the spreadsheet:

a.    <u>First row from the bottom</u>. The data entered in this row is dated the earliest in time. The "Start Date" and "Stop Date" are both 11/30/2001, and the "Inserted Date" is July 2, 2004. There is no "Updated Date." The P.O. Box is inserted in the Address column.[7]  The letters "DBO" appear in the "Inserted By" column.  N'Jai believes that "DBO" means the employer uploaded a report.  (Docket No. 72 at 30).  N'Jai has provided no evidence to show what DBO means or whose handwriting appears on the spreadsheet.  N'Jai admits that she does not know whose handwriting appears on the spreadsheet.  (Docket No. 72 at 83).

b.    <u>Second row from the bottom</u>. The "Start Date" is 12/1/2001 and the "Stop Date" is 3/1/2005. The "Inserted Date" is 7/1/2004 and the "Updated Date" is 3/4/2005. The name "Ben Load" appears in the "Inserted by" column. The P.O. Box is inserted in the Address column.[8]

c.    <u>Third row from the bottom.</u> The "Start Date" is 3/2/2005 which is also the "Inserted Date."  The "Stop Date" is 3/3/2005 and the "Updated Date" is 3/4/2005. The

---

[7]

N'Jai's P.O. Box address was on file with PSERS as early as 1998. (Plt. Ex. 25).

[8]

The year 2005 is a year in which N'Jai was employed with the Wilkinsburg School District, including the months of March through May.  (Docket No. 72 at 81, 90).

Rebecca Avenue address is inserted in the Address column.[9]  The letters "DBO" appear in the "Inserted By" column.

d.  <u>19 following rows.</u> There are approximately 19 rows in which the Rebecca Avenue address appears in the Address column. These rows contain Start, Stop, Inserted, and Updated dates ranging from March 2005 to February 2007.  The letters "DBO" appear in the "Inserted By" columns.

e.  <u>The third row from top</u>.  This row contains a "Start Date" of 4/20/2007 and a "Stop Date" of 6/17/2007. The "Inserted Date" is 4/20/2007, and the "Updated Date" is 6/18/2007.  The P.O. Box is inserted in the Address column. The name "Savannah Howard" appears in the "Inserted By" column. N'Jai is not familiar with Ms. Howard. (Docket No. 72 at 103).  The April 4, 2007 "Start Date" correlates to the form that N'Jai completed in April 2007 in response to PSERS' request that she update her address. (Plt. Ex. 1); (Docket No. 18-1 at 18).

f.  <u>Second row from top</u>. The "Start Date" is 6/18/2007 and the "Stop Date" is 3/11/2010. The "Inserted Date" is 6/18/2007 and the "Updated Date" is 3/12/2010.  The Rebecca Avenue address is inserted in the Address column. The name "Sandra Colantuono" appears in the "Updated By" column.  N'Jai is not familiar with Ms. Colantuono.  (Docket No. 72 at 103).  The letters "DBO" appear in the "Inserted By" column.

g.  <u>Top Row</u>. The "Start Date" is 3/12/2010 and there is no "Stop Date." The "Inserted Date" is 3/12/2010 and there is no "Updated Date." The PO Box is inserted in the Address column. Sandra Colantuono is named again in the "Inserted By" column.

34.  Plaintiff's Exhibit 1 also contains a spreadsheet titled "notes for member Jacqueline B. N'Jai" that contains three rows and four columns.  (Plt. Ex. 1); (Docket No. 18-1 at 15).  This spreadsheet documents the two instances where a 1099 form addressed to N'Jai was

---

[9]

The year 2005 is a year in which N'Jai was employed with the Wilkinsburg School District, including the months of March through May.  (Docket No. 72 at 81, 90).

returned to PSERS, and the instance in 2010 where PSERS suspended the direct deposit to N'Jai's bank account because it believed it had an invalid address for her for at least 15 months. This document contains a "user" column in which the following names appear: "Cal Campbel", "Saunders", and "Crawford." N'Jai does not know these persons. (Docket No. 72 at 100-101).

35.    Because contributions to retirement were being deducted from N'Jai's pay while she worked for Wilkinsburg in 2004-05, Wilkinsburg would have provided information to PSERS in connection with her pay, deductions, etc. during the 2004-05 school year. (Docket No. 72 at 81, 88-90). The Pittsburgh Board of Public Education would provide PSERS with similar information for active employees. *Id*.

36.    N'Jai believes that the names listed on the spreadsheet described above are people that work for PSERS. (Docket No. 72 at 87).

37.    Against this factual backdrop, N'Jai argues that a Board employee improperly and repeatedly transferred, or uploaded, information about her home address to PSERS after her separation from the Board in 2001. (Docket No. 72 at 87, 97). No representative from PSERS has provided testimony to support or counter N'Jai's allegations.

### B.    *Testimony of Board Representative Nancy Kusko*

38.    Nancy Kusko ("Kusko") is the Director of Benefits Administration for the Board and has held the position for six years. (Docket No. 72 at 4). She has worked in benefits administration for a total of 11 years. (Docket No. 72 at 4).

39.    Kusko's duties and responsibilities to the Board are to oversee the daily operations of all of the benefit programs offered to all active and retired employees of the Board as well as to be the liaison between the Board and PSERS. (Docket No. 72 at 4-5).

40.     Kusko's office reports wages, contributions and service time of active employees to PSERS. (Docket No. 72 at 5).

41.     Kusko testified that once a Board employee retires, Kusko's office does not report information to PSERS. (Docket No. 72 at 5-9). The only communication Kusko's office has with PSERS pertaining to retirees would be if the retiree's account is audited by PSERS. (Docket No. 72 at 5). A PSERS audit of a retiree's account could include a question regarding the service time reported for the employee. *Id*.

42.     In 2003, PSERS inquired of Kusko's office in regard to salaries reported for N'Jai in her final year of employment prior to her retirement for the purposes of the final calculation of a pension benefit. (Docket No. 72 at 6-7); (Def. Ex. A). According to Kusko's testimony, this is the most recent communication between Kusko's office and PSERS pertaining to N'Jai, (Docket No. 72 at 6, 8), and this type of inquiry, or audit, is similar to the type the Board would receive from PSERS pertaining to other employees. (Docket No. 72 at 7). Kusko provided that the Board has access to payroll data of the retired employees in order to answer questions from PSERS similar to the inquiry from 2003. (Docket No. 72 at 19).

43.     Kusko testified that the Board does upload information for <u>active</u> employees but that it does not upload anything on a former employee. (Docket No. 72 at 20).

44.     Kusko's office responded to the audit of N'Jai's account, and she testified that the Board has had no other communication with PSERS since November 2003 in regard to N'Jai. (Docket No. 72 at 7-8).

45.     Kusko stated that since July 2004, the current method of reporting name and address changes for an <u>active</u> employee is on a monthly basis. (Docket No. 72 at 8). According to Kusko, a change in the name or a change in address of an active employee would be made

through a monthly file upload process with PSERS. *Id*. at 9. In order to update data for current employees, the Board uploads files through a secure website into the PSERS website. *Id*. at 20.

46.     Kusko testified that when an individual is retired from the Board, the Board no longer has the ability to make any changes to that individual's PSERS retirement account. (Docket No. 72 at 8, 19-20).

47.     Kusko's understanding is that PSERS requires a writing to be sent from the retiree directly to PSERS in order to change that retiree's address in the PSERS system. (Docket No. 72 at 9).

48.     Kusko's office maintains paper files on former employees who are considered retirees. Included in this file are items such as the retiree's original beneficiary card or healthcare enrollment forms from when they were an active employee, and any changes to those forms. (Docket No. 72 at 21).

49.     In light of this lawsuit, the Board asked Kusko to locate the most recent documentation contained in the paper file that the Board maintains on N'Jai. Kusko was able to locate paperwork sent to her office by PSERS in 2003 pertaining to an audit in 2003. (Docket No. 72 at 21); (Def. Ex. A).

50.     According to Kusko, the only employee address that would be in the paper file would be the address N'Jai used at the time her employment with the Board ended. (Docket No. 72 at 22).

51.     N'Jai had never met or spoken to Kusko prior to the February 9, 2011 hearing. (Docket No. 72 at 76).

52.     N'Jai does not know anyone in Kusko's office. (Docket No. 72 at 76-77).

### C.    *Prior Lawsuits Filed by N'Jai*

53.    The following lawsuits were initiated by N'Jai in the United States District Court

for the Western District of Pennsylvania against the Board and/or its employees:

a)    *N'Jai v. Mary Ellen McBride*, Civ. A. No. 94-72
      **Disposition:** Defendant's Motion for Summary judgment granted;

b)    *N'Jai v. Pittsburgh Board of Public Education, et al.,* Civ. A. No. 94-2096
      **Disposition:** Jury verdict for the Defendants;

c)    *N'Jai v. Pittsburgh Board of Public Education*, *et al.,* Civ. A. No. 98-640 and 98-
      1883 (consolidated)
      **Disposition:** Jury verdict for the Defendants;

d)    *N'Jai v. Pittsburgh Board of Public Education, et al.,* Civ. A. No. 94-2096
      **Disposition:** Defendants' Motion for Summary Judgment granted;

e)    *N'Jai v. Pittsburgh Board of Public Education, et al.,* Civ. A. No. 99-645
      **Disposition:** Defendants' Motion for Summary Judgment granted;

f)    *N'Jai v. Pittsburgh Board of Public Education, et al.,* Civ. A. No. 99-1290
      **Disposition:** Defendants' Motion for Summary Judgment granted;

g)    *N'Jai v. Pittsburgh Board of Public Education, et al.,* Civ. A. No. 01-1826
      **Disposition:** Defendants' Motions to Dismiss were granted;

h)    *N'Jai v. Pittsburgh Board of Public Education, et al.,* Civ. A. No. 02-0268
      **Disposition:** Defendants' Motions to Dismiss were granted; and

i)    *N'Jai v. Pittsburgh Board of Public Education, et al.,* Civ. A. No. 07-1506
      **Disposition:** District Court (J. Fischer) granted Defendants' Motions to Dismiss
      and Third Circuit affirmed. *See N'Jai*, 386 F. App'x. 141 (3d Cir. 2010).

54.    Additionally, the Court is aware of the following actions filed in state court:

a)    *N'Jai v. Pittsburgh Board of Public Education*, *et al*., GD 99-12829 in the
      Allegheny County Court of Common Pleas
      **Disposition:** Defendants' preliminary objections sustained;

b)    *N'Jai v. Pittsburgh Board of Public Education*, *et al.,* AR-00-775 in the
      Allegheny County Court of Common Pleas
      **Disposition:** Judgment for the Defendants (affirmed by the Pennsylvania
      Commonwealth Court). *See N'Jai*, 803 A.2d 878 (Pa.Cmwlth. 2002);

c) *N'Jai v. Pittsburgh Board of Public Education*, *et al.,* AR 00-3167 in the Allegheny County Court of Common Pleas
**Disposition:** Defendants' Motions for Summary Judgment granted (affirmed by the Pennsylvania Commonwealth Court). *See N'Jai*, 799 A.2d 995 (Pa.Cmwlth 2002);

d) *N'Jai v. Pittsburgh Board of Public Education*, *et al.,* AR 00-4416 in the Allegheny County Court of Common Pleas
**Disposition:** Judgment of Non-pros was entered on 10/06/2000;[10]

e) *N'Jai v. Pittsburgh Board of Public Education*, *et al.,* SA 01-952 in the Allegheny County Court of Common Pleas
**Disposition:** Defendants' preliminary objections sustained; and

f) *N'Jai v. Anthony Sanchez, et al.,* 533 M.D. 2001 in the Commonwealth Court of Pennsylvania and GD 01-023695 in the Allegheny County Court of Common Pleas (Commonwealth Court transferred the case to Common Pleas for lack of jurisdiction).
**Disposition:** Preliminary objections by Defendants were sustained.

55. Further, N'Jai has significant experience at both the federal and state appellate court level. To this Court's knowledge, in addition to *N'Jai v. Floyd*, 2009 WL 4823839, Civ. Act. No. 07-1506 (W.D. Pa. Dec. 9, 2009), *aff'd*, 386 F. App'x. 141 (3d Cir. 2010), N'Jai has appeared in the following matters on appeal:

(a) *N'Jai v. McBride*, 52 F.3d 316 (3d Cir. 1995) (affirming Judge Diamond's dismissal of Civ. A. No. 94-72);

(b) *N'Jai v. Pittsburgh Board of Public Education*, 537 U.S. 1199 (2003) (petition for writ of mandamus denied);

(c) *N'Jai v. EEOC*, 80 F.App'x. 287 (3d Cir. 2003) (summary judgment for the EEOC at Civ. A. No. 99-1290 affirmed);

(d) *N'Jai v. Pittsburgh Board of Public Education*, 55 F.App'x. 105 (3d Cir. 2003) (jury verdict for Defendants at Civ. A. No. 98-640 affirmed);

---

[10]

This case was an appeal by the Board of a default judgment entered by a magisterial district judge on June 22, 2000. What appears to be a redundant appeal was docketed at AR-00-4556. N'Jai filed a motion to consolidate AR 00-4556 with AR 00-4416, after the case docketed at AR 00-4416 had already been dismissed for failure by N'Jai to file a Complaint.

(e)     *In re N'Jai*, 210 F.3d 358 (3d Cir. 2003) (Plaintiff's petition for writ of mandamus to remove the Honorable William L. Standish from several of her civil actions denied);

(f)     *N'Jai v. Pittsburgh Board of Public Education*, 32 F.App'x. 31 (3d Cir. 2002) (jury verdict for Defendants at Civ. A. No. 94-2096 affirmed);

(g)     *N'Jai v. Pittsburgh Board of Public Education*, 151 F.3d 1026 (3d Cir. 2003) (Civ. A. No. 94-2096 affirmed in part, reversed for clarification of Court Order);

(h)     *N'Jai v. Pittsburgh Board of Public Education*, 799 A.2d 995 (Pa.Cmmw. 2002) (summary judgment at AR-00-3167 affirmed, petition for allowance of appeal denied at 809 A.2d 906 (Pa. 2002)); and

(i)     *N'Jai v. Sanchez*, 845 A.2d 269 (Pa.Commw. 2004) (dismissal at GD 01-023695 affirmed).

56.     In support of N'Jai's allegation that she has previously successfully sued the Board and received judgments against the Board, she cites a series of claims initiated before Magisterial District Judge Kevin E. Cooper.   (Docket No. 72 at 109-120).  The following subparagraphs set forth the relevant procedural history:

a.     The first litigation N'Jai references is a lawsuit filed by her on November 10, 1999. (Plt. Ex. 14 at 2); (Civil Complaint, CV-0000462-99). In this case, N'Jai requested $4000 in damages for breach of contract, stating that money was taken from her paycheck without just cause. *Id.*; (Docket No. 72 at 115). On January 27, 2000, Magisterial District Judge Kevin E. Cooper entered a default judgment in favor of N'Jai. (Plt. Ex. 14 at 2); (Civil Complaint, CV-0000462-99); (Docket No. 72 at 118). The Board filed a timely appeal to the Allegheny County Court of Common Pleas which was docketed at AR 00-000775.  A panel of arbitrators awarded N'Jai the amount of $1705 on April 11, 2000. (Plt. Ex. 22); (Docket No. 73 at 35). The Board filed a timely appeal and Judge Livingstone M. Johnson dismissed N'Jai's Complaint on May 17, 2001. N'Jai filed an appeal to the Pennsylvania Commonwealth Court, which affirmed on June 24, 2002. (Plt. Ex. 21); (Docket No. 73 at 34). N'Jai filed an appeal to the Pennsylvania Supreme Court which was denied on December 27, 2002. *See N'Jai*, 813 A.2d 847 (Pa.Super. 2002).

b.      The second litigation N'Jai references is a claim filed by her on March 21, 2000. (Plt. Ex. 5 at 2); (Civil Complaint, CV-0000094-00); (Docket No. 72 at 112). In this case, she alleged that the Board retaliated against her for her participation in the prior case docketed in the Court of Common Pleas at AR 00-00775, breach of contract, false imprisonment and "banning from a public institution for unjust reasons." (Plt. Ex. 5 at 2), (Civil Complaint, CV -0000094-00). She also claimed that the Board took three paychecks from her for unjust reasons. *Id*. Magisterial District Judge Kevin E. Cooper entered a default judgment against the Board on April 20, 2000 in the amount of $4,085.00. (Plt. Ex. 5, at 3); (Docket No. 72 at 118). The Board filed a timely appeal to the Court of Common Pleas which was docketed at AR 00-003167.  A panel of arbitrators awarded N'Jai the amount of $990.00 (Plt. Ex. 15) and the Board filed a timely notice of arbitration appeal.  On October 15, 2001, the Honorable Livingstone M. Johnson dismissed N'Jai's action with prejudice, after which she filed a notice of appeal to the Pennsylvania Commonwealth Court.  On May 22, 2002, the Commonwealth Court affirmed the Order of Judge Johnson. *Id*. *See N'Jai*, 799 A.2d 995 (Pa.Cmwlth. 2002).

c.      The third action N'Jai references was filed with Magisterial District Judge Kevin E. Cooper on May 31, 2000. (Plt. Ex. 3 at 2); (Civil Complaint, CV-000197-00); (Docket No. 72 at 110-11, 114). N'Jai again alleged retaliation among other items. *Id*. A default judgment was entered on June 22, 2000, (Docket No. 72 at 111, 118), in the amount of $4,088.00. (Plt. Ex. 3 at 1); (Plt. Ex. 12). The Board filed a timely appeal. (Plt. Ex. 6); (Plt. Ex. 7).  It appears that the Board's appeal was docketed redundantly at two numbers in the Allegheny County Court of Common Pleas, AR 00-004556 and AR 00-004416.  (Plt. Ex. 6); (Plt. Ex. 7).  As for the case docketed at AR 00-004416, a judgment of non-pros due to N'Jai's failure to file a complaint was entered on October 6, 2000. (Plt. Ex. 6); (Docket No. 72 at 119).  As for the case docketed at AR 00-004556, the Board filed an Answer to the Complaint on August 21, 2000.  (Plt. Ex. 7); (Plt. Ex. 13). On October 29, 2001, the Honorable R. Stanton Wettick, Jr. quashed a subpoena served on the Sheriff by N'Jai.  (Plt. Ex. 7).[11] On November 15, 2001, N'Jai filed a motion to

---

[11]

The Motion to Quash Subpoenas was filed under docket number AR 00-004416 on October 10, 2001. However, Judge Wettick's order was entered under docket number AR 00-004556 on October 26, 2001. (*See* Plt. Ex. 6 and 7).

consolidate AR-00-004556 with AR-00-004416 "on the ground that they all stem from [Magisterial District Judge Kevin E. Cooper's June 22, 2000 judgment]," even though AR-00-004416 had already been dismissed. *Id*. No court order consolidating the cases was entered. *Id*. On December 19, 2002, N'Jai filed a notice that she is awaiting trial, but the docket entries do not reflect that she pursued the case to trial. *See N'Jai v. Pittsburgh Board of Education, et al.,* AR-00-004556.[12]

57.     The following is a non-exhaustive list of various types of claims N'Jai has raised against the Board beginning in 1994 and the associated docket numbers:

a.  Racial discrimination (Civ. A. No. 94-2096, Civ. A. No. 07-1506);

b.  Sexual harassment (Civ. A. No. 98-640);

c.  Discrimination because she had a contagious disease which another employee contracted and failed to report (Civ. A. No. 94-2096);

d.  Retaliation because she learned of illegal drug sales on school grounds (Civ. A. No. 98-640);

e.  Fraud (Civ. A. No. 99-1290);

f.  Defamation and slander (Civ. A. No. 99-1290, Civ. A. No. 07-1506, Civ. A. No. 10-1323);

g.  Conspiracy (Civ. A. No. 99-1290, Civ. A. No. 07-1506, Civ. A. No. 10-1323);

h.  Violation of constitutional rights (Civ. A. No. 99-1290, Civ. A. No. 07-1506, Civ. A. No. 10-1323);

i.  Her pay was improperly docked (Civ. A. No. 99-1290), (AR-00-000775), (AR-00-003167), (AR-004556 and AR 00-4416);

j.  The credit union mishandled and misappropriated her funds (Civ. A. No. 99-1290);

---

[12]

The Clerk's office for the Allegheny County Court of Common Pleas did not provide a document number on the Court's docket. The docket simply reads: "Notice. The Plaintiff is awaiting trial." This is the last docket entry in the case filed at AR-00-004556.

k. Students assaulted her with a chair and frisbee yet officials failed to take appropriate action (Civ. A. No. 99-1290);

l. Her disability (depression) was not properly accommodated (Civ. A. No. 99-1290, Civ. A. No. 07-1506);

m. Age discrimination (Civ. A. No. 07-1506);

n. Release of "false and other medical confidential information" by school personnel (Civ. A. No. 07-1506);

o. A Privacy Act claim based upon allegations that the Board disclosed "confidential" information about Plaintiff, namely her address, without her permission (Civ. A. No. 10-1323);

p. Title VII retaliation claims based upon allegations that the Board gave negative job references to her employers (Civ. A. No. 07-1506, Civ. A. No. 10-1323); and

q. False imprisonment and "banning from public institution for unjust reasons." (AR-00-00775).

58. N'Jai did not speak with anyone at the Board about the issues relating to her pension payments prior to filing this lawsuit. (Docket No. 72 at 87, 96-97). Nor, based on the present record, did she make any written complaint to the Board. (Docket No. 72 at 97). Indeed, N'Jai has stated that she has not communicated with the Board since her employment ended and that her only interaction with the Board since 2001 has been through or in connection with litigation. *Id.*

## IV. Legal Standard

The United States Court of Appeals for the Third Circuit has held that if a district court determines that a litigant's past and current lawsuits constitute a continuous pattern of "groundless and vexatious litigation," the All Writ's Act, 28 U.S.C. § 1651(a),[13] permits the

_____

13

"The Supreme Court and all Courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a).

court, under exigent circumstances, to grant an Order enjoining the litigant from filing further actions without the permission of the Court. *See In re Vora*, 2008 WL 4722516, at *2, Civ. Act. No. 08-104 (W.D. Pa. Oct. 21, 2008) (citing *In re Oliver*, 682 F.2d 443, 445-46 (3d Cir. 1982) (issuing an injunction because the plaintiff had filed over 50 frivolous civil rights cases)).

In issuing such an injunction, the Court must comply with three requirements. *Crooker v. Delta Management Associates, Inc*., 2010 WL 1390868, at *4, Civ. Act. No. 10-101 (M.D. Pa, Apr. 1, 2010). First, the Court may not restrict the litigant from filing claims absent exigent circumstances, such as a litigant's continuous abuse of the judicial process by filing meritless and repetitive actions. *Id*. (citing *Matter of Packer Ave. Assoc*., 884 F.2d 745, 747 (3d Cir. 1989)). Second, if the Court finds that the circumstances warrant the imposition of an injunction, the Court must give notice to the litigant to show cause why the proposed injunctive relief should not issue. *Id*. (citing *Gagliardi v. McWilliams*, 834 F.2d 81, 83 (3d Cir. 1987) (holding that "[a]fter a proper record has been established, the district court will be in a better position to determine the appropriate action that should be taken."). Third, the scope of the injunction must be narrowly tailored to fit the particular circumstances of the case. *Id*. (citing *Chipps v. United States Dist. Ct. for the Middle Dist. of Pa*., 882 F.2d 72, 73 (3d Cir. 1989)).

"There is simply no support in the law for permitting an injunction prohibiting a litigant from ever again filing a document in federal court." *Matter of Packer Ave. Assoc*., 884 F.2d at 747. Hence, the district court may only enter an injunction directing that the litigant not file any claims without first being granted leave of court. *Abdul-Akbar v. Watson,* 901 F.2d 329, 333 (3d Cir. 1990). In seeking leave of court, the litigant must certify: "(1) that the claims the litigant wishes to present are new claims never before raised and disposed of on the merits by any federal courts; (2) that the litigant believes the facts alleged in the complaint to be true; and (3)

that the litigant knows of no reason to believe his [or her] claims are foreclosed by controlling law." *Id.* In addition, the injunction should state that upon a failure to certify or upon a false certification, the litigant may be found in contempt of court and punished accordingly. *Id*. Indeed, this is the remedy that the Board seeks in the instant case. (Docket No. 13).

N'Jai frequently relies on her *pro se* status to protect her from the potential impact of the Board's motion. Indeed, a document filed by a *pro se* party is "to be liberally construed," *Estelle v. Gamble*, 429 U.S. 97, 106 (1976), and "a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). However, the *Crooker* court recognized the amount of leeway that is usually afforded to a *pro se* plaintiff but found that the plaintiff's *pro se* status could not shield him from the consequences of what amounts to purposeful bad faith litigation.[14] *Crooker*, 2010 WL 1390868, at *4. Thus, N'Jai's *pro se* status alone does not shield her from the injunctive relief that the Board seeks.

## V. Discussion

The Board argues that N'Jai's extensive record of suing the Board, coupled with her lack of success, indicates that her intent is to harass rather than advance good faith claims. (Docket No. 14). In support of its motion, the Board references N'Jai's prior lawsuits filed in both federal and state court that determined that N'Jai had attempted to re-litigate old claims such as discrimination, harassment, denial of benefits, exposure to disease and theft of paychecks. *See, e.g., N'Jai v. Anthony Sanchez*, No. 522 C.D. 2003 (Pa. Commw. Ct. 2004). The Board contends that an injunction is necessary to prevent N'Jai from filing future abusive and groundless

---

[14]

The *Crooker* court noted that its power to grant this type of injunction is limited by two fundamental rights: (1) the litigant's rights to due process and (2) the litigant's right to have access to the courts. *Crooker*, 2010 WL 1390868, at *4 (citing *Brow v. Farrelly*, 994 F.2d 1027, 1038 (3d Cir. 1993)).

lawsuits against the Board given the significant expense it has borne defending itself from claims dating back to 1994. (Docket No. 14 at 5). The Board maintains that exigent circumstances exist given N'Jai's extensive history of unsuccessful litigation and the fact that she has not been employed by the Board since 2001 yet she is still filing lawsuits against it in 2010. *Id.*

N'Jai has been provided notice of the Board's motion and she has had an opportunity to show cause why the proposed injunctive relief should not issue.[15] *See Gagliardi*, 834 F.2d at 83. In her responses, N'Jai provides that none of her previous claims against the Board were frivolous. (Docket No. 17 at 1). She also asserts that this lawsuit stems from actions by an unnamed Board employee who wrongfully accessed her "state retirement fund and misused her social security number, name and other confidential information to retaliate against her for participating in prior protected activities." *Id.* at 2. N'Jai maintains that the facts that support her claim for "retaliation" and "invasion of privacy" against the Board in this case are not the same facts used to support her claims against the Board in prior lawsuits. *Id.* She repeatedly asserts that she has not previously sued the Board for "invasion of privacy" because she did not

---

15

In addition, N'Jai continues to reference the *Poulis* factors in her pleadings. (Docket No. 18 at 14). *Poulis v. State Farm & Casualty Co.*, 747 F.2d 863 (3d Cir. 1984), addressed the propriety of dismissal under Rule 41(b) by enumerating a host of factors which a trial court must weigh before dismissing a case. *See id.*; *see also United States v. $8,221,877.16 in U.S. Currency*, 330 F.3d 141, 161 (3d Cir. 2003) (The *Poulis* factors must be weighed by a district court in determining whether the harsh sanction of dismissal is justified."). The *Poulis* factors that the district court must consider are: (1) the extent of the party's personal responsibility; (2) the prejudice to the adversary caused by the failure to meet scheduled orders and respond to discovery; (3) a history of dilatoriness; (4) whether the conduct of the party or the attorney was willful or in bad faith; (5) the effectiveness of sanctions other than dismissal, which entails an analysis of alternative sanctions; and (6) the meritoriousness of the claim or defense. *Poulis*, 747 F.2d at 868. However, the Board is not seeking dismissal as a sanction under Rule 41(b).

24

discover these alleged acts which resulted in her delayed benefit payments until 2010.[16] (Docket No. 18 at 2).

Despite N'Jai's extensive history of suing the Board, N'Jai's claims against the Board for allegedly changing her address and the resulting delay in her receipt of benefit payments from PSERS have not been previously litigated. Here, N'Jai's claims center on whether a Board employee improperly and repeatedly transferred, or uploaded, information about N'Jai's home address to PSERS after her separation from the Board in 2001 causing PSERS to suspend payments to N'Jai because it believed it had an invalid address for her for at least 15 months. (Plt. Ex. 1); (Docket No. 18-1 at 15). These claims are distinct from N'Jai's seven prior actions against the Board in federal court and five prior actions against the Board in state court. As outlined in detail above, N'Jai's present claims stem from alleged acts of Board employees that occurred as recently as 2010. N'Jai's claims do not relate to actions taken by Board employees during N'Jai's employment with the Board through 2001. (Docket No. 13 at 5). Because N'Jai believes that the Board retaliated against her during her term as a retiree of the Board, it is of no consequence that her employment with the Board ended in 2001. Moreover, as her claims are new, N'Jai's lack of success in prior lawsuits against the Board for unrelated claims is not determinative.

Although some courts have enjoined overly litigious plaintiffs from filing further actions, this Court does not find that N'Jai's claims amount to "groundless and vexatious litigation"

---

The Court construes N'Jai's reference to her "invasion of privacy" claim against the Board as a claim pursuant to the Privacy Act of 1974, 5 U.S.C. § 552a, which she discusses at great length in her response to the Board's motion (Docket No. 18 at 6) as well as her Amended Complaint. (*See* Docket No. 106). Whether N'Jai can recover under the Privacy Act is an issue raised in the Board's pending "Motion to Dismiss, Or in the Alternative, Motion for Summary Judgment." (Docket No. 115). The Court will address this issue in a separate opinion when it rules on the Motion.

against the Board. *See, e.g., In re Oliver*, 682 F.2d at 446 (issued an injunction because plaintiff filed over 50 civil rights, habeas corpus and other types of cases in 12 years); *In re Vora*, 2008 WL 4722516, at *1 (issued an injunction because the plaintiff filed over 50 lawsuits against various governmental agencies over a 20 year period; the plaintiff's filings would consistently exceed 50 pages; and the filings were often soiled or torn such that it was difficult for the Clerk's Office to enter the documents in the Court's electronic filing system); *Crooker*, 2010 WL 1390868, at *4 (issued an injunction against the plaintiff because he had filed more than 100 civil actions across the country); *Matter of Packer Ave. Assoc.*, 884 F.2d at 747 (issued an injunction because the plaintiff filed 27 petitions re-litigating issues that had already been disposed of in bankruptcy court).

Unlike these cases, N'Jai's current claims have not been previously litigated. She has never brought a claim against the Board related to the actions of an unnamed Board employee who allegedly wrongfully accessed her PSERS account causing PSERS to remove her from its payroll. Moreover, her alleged injuries occurred as a result of delayed benefit payments in February and March of 2010. (Docket No. 72 at 25). N'Jai's most recent lawsuit against the Board was filed on November 8, 2007 and this Court's dismissal of her claims was not affirmed by the Court of Appeals for the Third Circuit until July 8, 2010. *See N'Jai v. Floyd*, 2009 WL 4823839, at *6, Civ. Act. No. 07-1506 (W.D. Pa. Dec. 9, 2009), *aff'd*, 386 F. App'x. 141 (3d Cir. 2010). Therefore, it is clear that, in this instance, N'Jai is not re-litigating old claims.[17] Indeed, as the Court has found as to this proceeding, PSERS removed N'Jai from its payroll causing two direct deposits to be delayed (Docket No. 72 at 25, 28-29). In addition, Kusko provided that the

---

[17] She may attempt to argue that the delay in her pension payments is a form of retaliation by the Board and its employees, but as the Court points out *infra* such claim background will be limited by the Court. *See* pages 28-29.

Board has access to payroll data of the retired employees (Docket No. 72 at 19) but that it does not have the ability to make changes to that individual's PSERS retirement account. (Docket No. 72 at 8, 19-20). Yet, N'Jai states that her information was changed and there was, at a minimum, a delay in her payment. (Docket No. 72 at 87, 97). In addition, documentary evidence seems to support some of her allegations. (*See Pltf. Ex. 1*, Docket No. 18-1 at 26; and Docket No. 72 at 32). Moreover, N'Jai attempts to comply with the Court's Orders; policies and procedures in this litigation. Hence, the Court does not find that exigent circumstances exist to warrant the extraordinary remedy of an injunction. *See Matter of Packer Ave. Assoc.*, 884 F.2d at 747 (finding that exigent circumstances exist when a litigant continually abuses the judicial process by filing meritless and repetitive actions). Despite what some would consider N'Jai's litigious nature, an Order enjoining her from filing future actions in this Court against the Board would be overbroad.

"When a court employs the extraordinary remedy of an injunction, it directs the conduct of a party, and does so with the backing of its full coercive powers." *Nken v. Holder*, 129 S.Ct. 1749, 1758 (2009). As such, injunctions should not be granted as a matter of course. *See Sossamon v. Texas*, 131 S. Ct. 1651, 1665 (2011). "Courts of equity should pay particular regard for the public consequence in employing the extraordinary remedy of an injunction." *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706 (1996). Here, the injunction that the Board seeks deprives an individual of their access to the court. "Access to the courts is a fundamental tenant of our judicial system; legitimate claims should receive a full and fair hearing no matter how litigious the plaintiff may be." *In re Oliver*, 682 F.2d at 446. Moreover, "[a] plaintiff's litigiousness alone would not support an injunction restricting his [or her] filing activities." *Id*. Indeed, given N'Jai's *pro se* status, her pleadings are "to be liberally construed," *Estelle v.*

*Gamble*, 429 U.S. 97, 106 (1976), and her Amended Complaint "must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). As discussed above, when liberally construed, N'Jai's Amended Complaint sets forth claims that have never before been litigated in federal or state court. *Id*. Although N'Jai's filings may be difficult to decipher, the allegations in her current Amended Complaint do not warrant an Order from this Court enjoining her from filing future lawsuits against the Board because her current claims are based on new facts.[18] Accordingly, this Court will not restrict her access to the judicial system simply because she has filed numerous lawsuits against the Board.

To the extent the Board is concerned regarding the potential injection of resolved claims into the present proceedings, the Court construes N'Jai's references to her prior claims and prior lawsuits as mere background information and the Court will determine what, if any, weight should be given to such information.[19] To that end, the Federal Rules of Civil Procedure provide a vehicle for defendants to move to strike matters in N'Jai's pleadings that are "redundant,

---

[18]

Further, the Court notes that the Board's companion defendants, the Imani Defendants and the NAACP, have moved to settle this case based on allegations against them. (Docket No. 117). Following argument on the defendants' motions to dismiss, the Court granted the Imani Defendants' oral motion to refer this matter to a magistrate judge. (Docket No. 100). A mediation session was held with Chief Magistrate Judge Lisa Pupo Lenihan on May 19, 2011 wherein the parties agreed to a tentative settlement. (Docket No. 117). Subsequently, the Court granted N'Jai's motion for extension of time to obtain the advice of counsel to address any ongoing issues with respect to the release between N'Jai, the NAACP and the Imani Defendants. (Docket No. 124). The Board declined to participate in this mediation. (Docket No. 117).

[19]

Even if the Court determines that evidence is relevant, it "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." FED. R. EVID. 401, 403; *Novartis Pharmaceuticals Corp. v. Teva Pharmaceuticals USA, Inc*., 2009 WL 3754170, at *9, Civ. A. No. (D.N.J. Nov. 5, 2009) (precluding the plaintiff's prior and/or collateral litigations because they were likely to result in unfair prejudice, confusion and undue delay).

immaterial, impertinent or scandalous." FED. R. CIV. P. 12(f);[20] *Correctional Medical Care, Inc. v. Gray*, 2008 WL 248977, at *18, Civ. Act. No. 07-2840 (E.D. Pa. Jan. 30, 2008). Additionally, prior to trial, the Court will conduct extensive pretrial proceedings and the Board will have numerous opportunities to present objections to any references N'Jai may make to her prior claims against the Board through potential motions on the pleadings, for summary judgment and in limine as well as proposed instructions to the jury, if this case proceeds that far. *See, c.f., Mavrinac v. Emergency Medicine, et al.*, Civ. A. No. 04-1880. This Court will not entertain any claims that have been previously litigated in federal or state court. *See Crooker*, 2010 WL 1390868, at *4 (imposing Rule 11[21] monetary sanctions for plaintiff's long litigation history, amounting to an abuse of the judicial process).

---

[20]

"The Court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent or scandalous matter. The Court may act: (1) on its own; or (2) on motion made by a party either before responding to the pleading or, is a response is not allowed, within 21 days after being served with the pleadings." FED. R. CIV. P. 12(f).

[21]

Federal Rule of Civil Procedure 11 provides, in pertinent part: "**Representations to the Court.** By presenting to the court a pleading, written motion, or other paper – whether by signing, filing, submitting or later advocating it – an attorney or unrepresented party certifies that to the best of the person's knowledge, information and belief, formed after an inquiry reasonable under the circumstances: (1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) the claims, defenses, and other legal contentions are warranted by existing law or by a non-frivolous argument for extending, modifying or reversing existing law or for establishing new law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on belief or a lack of information." FED. R. CIV. P. 11(b).

**VI.     Conclusion**

For the foregoing reasons, the Board's Motion for Order to Show Cause Why an Injunction Should Not be Issued Directing the Clerk of Courts to Refuse to Accept Complaints filed by N'Jai Against the Pittsburgh Board of Public Education (Docket No. [13]) is DENIED. An appropriate Order follows.

_s/Nora Barry Fischer_
Nora Barry Fischer
United States District Judge

Dated: June 10, 2011

cc/ecf: All counsel of record.

      Jacqueline B. N'Jai
      P.O. Box 10133
      Pittsburgh, PA 15232
      (Regular & Certified Mail)